THE STATE v. SAM BEARD, Appellant—68 S. W. (2d) 698.

Division Two, February 23, 1934.

*Sam J. Corbett* for appellant.

*Roy McKittrick*, Attorney-General, and *William W. Barnes*, Assistant Attorney-General, for respondent.

FITZSIMMONS, C.—In the Circuit Court of Pemiscot County defendant was found guilty of murder in the second degree for that he had killed one Charles Jones. Punishment was assessed at twenty years' imprisonment in the penitentiary. From the sentence and judgment an appeal was taken.

The testimony on behalf of the State shows that on Saturday evening, April 9, 1932, four white men and defendant Beard, colored, gathered at the home of Bennie Parham, colored, about a mile and a half north of the town of Swift in Pemiscot County. Parham's house was about 175 feet from a point where the Wardell sand road crosses the tracks of the Frisco Railroad. Defendant Beard was the last to arrive, he coming about eight o'clock. He had a flash light. He also had a pair of dice and he started a game of craps. But he lost what money he had and he sold some tobacco for ten cents in order to resume play. Lonnie Pullem, who had $1.75 or $2 was the most opulent of the group. He was seen to lend a dime to Charles Jones, who was killed later that night. After a short period of gaming, Parham, the host, objected to further play for the reason that he was expecting his wife and children home from a church supper at Swift. Soon after, the visitors drifted off to their several homes. Jones, Pullem and Beard were the last to leave, Beard being behind the two others. Beard returned and borrowed from Parham a lantern which Parham found in his yard the next morning. Jones and Pullem walked together 175 feet west of Parham's house to the crossing of the Wardell road and the Frisco track. There they stopped, chatted for a few minutes and parted. Pullem started to walk half a mile along the track to his home. Jones went east by the road.

Pullem had gone about ninety feet along the track when he was felled by a blow on the back of his head. After some moments of unconsciousness he came to and saw defendant Beard standing over him. Beard hit him again, and Pullem testified to a conversation which he then had with Beard. "I told him that anything I had that he wanted to take it, not to kill me, and he said: 'Doc, money is all I want.'" Beard took from Pullem $1.75 and hit him again. Before this last blow, Pullem had seen Jones coming to his aid. When next Pullem aroused himself to see what was going on, he saw Beard standing over and beating Jones, who lay on the right of way of the railroad, a short distance south of the point where Pullem was at or near the highway crossing. At this sight, Pullem crawled away north toward him home. His brother-in-law took him in and doctors treated his wounds for three weeks thereafter. Pullem testified that Beard used some instrument or object as a weapon in striking him and Jones. But Pullem did not know what the object was.

Harold Walker and several other young men, living at Wardell, and on their way home from Hayti, passed by automobile along the Wardell road about two o'clock in the morning of April 10. They saw a human body lying athwart the highway at the Frisco track. They had to drive around the body in order to avoid running over it. They stopped and examined it. It was the body of a dead white man. The top of the head was crushed. A freight train was approaching at the time, and a northbound passenger train had passed sometime

before. The body lay between the cattle guards, in the roadway, parallel to the railroad track and about two feet from it. They hurried home and notified a justice of the peace.

Officers who made an examination at daybreak identified the body as that of Charles Jones, who had been at Parham's house with Pullem and the others the night before. The left leg, left arm and some ribs were broken. The back of the head was crushed and the brains scattered across the road. The face was swollen and the cheek bone shattered. Jones' cap lay near the body. Pullem's cap was found near where he said he was struck down. A trail of blood led from Pullem's cap along the track to the door of the home of his brother-in-law, one-half mile north. But no signs of blood were seen between Pullem's cap and Jones' cap. This evidence tended to break down the theory advanced by defendant Beard that Pullem and Jones had a fight at the crossing and that the death of Jones resulted.

Defendant Beard was arrested at his home near Swift on the morning of April 10, shortly after the inquest. He had in his possession some dice and $1.25. A justice of the peace, a constable and two deputy sheriffs testified that they saw that morning what appeared to be spots of blood on his trousers and on one shoe. Beard admitted to the officers that the spots were blood, and he explained that they came from a finger cut which he had suffered a few days before while he was mending the automobile of his nephew A. D. Morris. At a later time he stated that the marks were grease spots. A deputy sheriff forced Beard to remove the trousers. They were held as evidence in a storeroom in the jail. At the trial the marks were not distinguishable as blood spots, and the county health officer testified that, in the interval between Jones' death and the trial, blood stains would fade. Beard, in his statement to the officers, denied that he killed Jones. He also said that after he left Parham's house, he went to the church supper at Swift, and that there he met C. W. Jackson and James Smith. A. D. Morris, Beard's nephew, denied that Beard had repaired Morris' automobile or had cut his Beard's finger, while so doing. C. W. Jackson, testifying for the State, said that he saw Beard at the church supper about 7:30 P. M., but he did not see him there again that night. Beard borrowed a flash light from Jackson and promised to return it in a few minutes but he did not do so. When Beard reached Parham's house about eight o'clock he had a flash light. Jackson again met Beard sometime after eleven o'clock while Jackson was on his way home from the supper, and was walking along a road about a mile or less from the Wardell road crossing. Beard walked with Johnson to the latter's house and there he gave to Johnson the borrowed flash light. James Smith, whom Beard said he had seen at the supper, denied that statement. Smith, who was walking home with Jackson after the church supper, told of meet-

ing Beard on a road near the fatal crossing. Beard volunteered the statement that he had been playing craps at Lacy Martin's house; that he had lost his money and clothes and that Martin generously had given back the clothes.

Beard, testifying in his own behalf, denied that he had hit Jones or Pullem. He admitted that he had been at Parham's house on the night of April 9, but denied that he had played craps although Parham had invited him to take part in a game which was in progress. He testified that he bought a half pint of whiskey from Parham, drank it and went to the church supper at Swift. He denied that he had stated to the officers that the blot on his trousers was a blood stain caused by a cut finger suffered while he was repairing his nephew's automobile.

R. M. Payne, an undertaker, gave the hideous details of the State of Jones' body when he took charge of it at the crossing. It was his opinion that Jones had been killed by a train.

The information upon which defendant was tried charged murder in the first degree in two counts. The first count informed the court that Beard on or about April 10, 1932, in Pemiscot County struck and beat Jones on the head with some unknown heavy weapon or instrument, inflicting mortal wounds of which Jones instantly died. The second count alleged that Beard, at the same time and place, struck and beat Jones on the head with an unknown heavy weapon or instrument, thereby inflicting mortal wounds, by reason of which Jones became insensible and stupefied; that while Jones was in such condition, Beard cast him upon the railroad track, Beard knowing that a train would pass over the track and kill Jones; that, shortly after, a train did in fact pass and run over Jones, killing him. The case was given to the jury on instructions submitting the issues of murder in the first and second degree. The form of these instructions was not questioned by the motion for a new trial.

██ I. Defendant complains that the second count is fatally defective in that it does not charge that the weapon or instrument which, it alleged, defendant used in making an assault on Jones was a dangerous and deadly weapon. The information charged that defendant, "feloniously, wilfully, premeditatedly, deliberately, on purpose and on his malice aforethought," made an assault on Jones "with some heavy weapon and instrument to the affiant, R. W. Hawkins unknown," etc. The assignment is wholly without merit. Section 3982, Revised Statutes 1929, provides that "every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, . . . shall be deemed murder in the first degree." A "dangerous and deadly weapon" is not a necessary element of any degree of murder. In State v. Hyland, 144 Mo. 302, 46 S. W. 195, the indict-

ment for murder in the first degree charged that the defendant "feloniously, wilfully, deliberately, premeditatedly, on purpose, and of his malice aforethought, with his fist in and upon the body, jaw, and head of him the said David Fitzgerald, did strike, knock, hit and beat," etc. This court, in holding the indictment good, said (144 Mo. 1. c. 312): "It was as much murder to kill deceased with his fist under the circumstances as if he had shot him with a loaded revolver or stabbed him with a sword." The court made a like ruling in State v. John, 172 Mo. 220, 72 S. W. 525, in which case also the defendant was charged with committing murder with his fist. In the instant case Pullem, the only witness who saw defendant strike Jones, testified that defendant used as a weapon some instrument or object which the witness could not identify. The poof was as definite as the indictment with respect to the weapon and both proof and charge were sufficient.

We may add that in State v. John, supra, the court made an observation which is pertinent here. It was that the indictment in that case as well as in the Hyland case, charged "not only that the defendant struck him with his fist, but knocked him down with great force and violence on the stone pavement, and by the combined force of the blow and the fall on the hard pavement the mortal wounding was accomplished." In like manner in the instant case, the second count of the information charged not only that defendant by blows of the unknown weapon which he wielded, inflicted mortal wounds on Jones, but also that, Jones having become unconscious, insensible and in a stupor of body and mind by reason of these mortal wounds, defendant cast, threw and pushed Jones upon the railroad track where he was run over and instantly killed.

II. Several assignments of error are based upon the allegation that, at a former trial upon the same information, defendant was found guilty of murder in the second degree on the second count of the information, that his punishment was assessed at twenty years' imprisonment, and that he was granted a new trial. From these premises defendant, in his motion for a new trial, argues that his former conviction of murder in the second degree was an acquittal of the charge of murder in the first degree, but that, despite this fact, he was again put on trial for murder in the first degree. These assignments also disclose that, at the former trial, the court required the State to elect upon which count it would go to the jury and that the State chose to have the case submitted upon the second count. In the trial here under review there was no motion for an election and no such requirement. We choose in this instance to pass the fact that the wholly unsupported allegations of the motion for a new trial present the sole record that there was a former trial and a conviction and an order granting to defendant a new trial. Treating these

assignments as if they were properly before us, we find that they are without merit. Many cases support this ruling. Reference to a few will be made.

In State v. Austin, 318 Mo. 859, 300 S. W. 1083, we held that Article II, Section 23 of the State Constitution which provides that a person shall not again be put in jeopardy "after once being acquitted by a jury" did not prevent a second trial even though the court had sustained the former motion for a new trial upon the ground of error in overruling demurrers to the evidence. The court ruled that a defendant in a criminal case, in moving and requesting a new trial, waived the right to plead former jeopardy.

In State v. Keating, 223 Mo. 86, 122 S. W. 699, the accused on a former trial was convicted upon the second count of the information and this court decided upon an appeal from that first conviction, that the information was insufficient as to both counts. At a second trial upon an amended information in two counts, defendant was found guilty and he appealed again. This court ruled that defendant had not been put in jeopardy a second time by reason of his former conviction on the second count and his acquittal by inference on the first count.

In Staye v. Akers, 278 Mo. 368, 213 S. W. 424, this court ruled that Article II, Section 23 of the Constitution contemplates a legal verdict of acquittal.

In State v. Baker, 264 Mo. 339, 175 S. W. 64, we held that the defense of a former acquittal should be raised by a proper plea in bar proof of which requires evidence *aliunde*.

No error appearing the judgment is affirmed. *Cooley* and *Westhues,* *CC.,* concur.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., is adopted as the opinion of the court. All the judges concur.